*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
July 11, 2025
12:13 PM

Plaintiff-Appellee,

v

No. 365933
Jackson Circuit Court
LC No. 2022-000301-FH

GRANT JOSEPH VAHOVICK,

Defendant-Appellant.

Before: MALDONADO, P.J., and BOONSTRA and WALLACE, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial convictions of assault with intent to do great bodily harm (AWIGBH), MCL 750.84, assault of a prison employee, MCL 750.197c, and prisoner in possession of a weapon, MCL 800.183(4). The trial court sentenced defendant as a fourth habitual offender, MCL 769.12, to concurrent prison terms of 12 to 30 years for the AWIGBH conviction, 6 to 20 years for the assault of a prison employee conviction, and 6 to 20 years for the prisoner in possession of a weapon conviction. We affirm defendant's convictions, but remand for resentencing.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

In 2021, defendant, an inmate with the Department of Corrections, attacked corrections officer Daniel Watson with a padlock tied to a cord. Watson testified that the attack was unprovoked and that he had not interacted with defendant before the assault. By contrast, defendant testified that Watson had threatened and harassed him during the week leading up to the assault, including threatening to take defendant to an isolation unit where Watson and other officers could beat him without being observed. According to defendant, Watson spit on him when he passed through the food line on the day in question, and defendant then retreated to his cell to fashion a weapon. Defendant admitted that he approached Watson from behind while Watson was supervising the food service line, and that he struck him on the head several times with a padlock to which he had attached a cord of fabric from his mattress. Surveillance video footage of the assault was played for the jury. Defendant's theory of the case was that defendant acted under duress. Specifically, defense counsel argued that Watson's threats and his show of disrespect for

-1-

defendant in front of other inmates had caused defendant to believe that his life was threatened, and that he assaulted Watson in order to prevent threatened harm to himself.

Defendant was convicted as described. At sentencing, the trial court assessed defendant 25 points for Offense Variable (OV) 3 and 15 points for OV 10, over defendant's objection. The trial court also assessed 50 points for OV 7, to which defendant did not object. The trial court sentenced defendant as described.

After defendant filed his claim of appeal, his appellate counsel passed away. This Court adjourned the hearing of defendant's appeal and remanded to the trial court for the appointment of substitute appellate counsel.[1] Defendant's substitute counsel moved this Court to file a supplemental brief, which this Court granted.[2] Counsel also moved this Court to remand this case to the trial court for a *Ginther*[3] hearing on the issue of his counsel's effectiveness, which this Court denied "without prejudice to a case call panel of this Court determining that remand is necessary once the case is submitted on a session calendar."[4]

This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant argues that the evidence at trial was insufficient to support his convictions because the prosecution failed to rebut defendant's evidence that his crimes were excused by the defense of duress. We disagree. This Court reviews de novo a challenge to the sufficiency of the evidence. *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010).

Due process[5] requires that every element of a crime be proved beyond a reasonable doubt in order to sustain a criminal conviction. *People v Hampton*, 407 Mich 354, 366; 285 NW2d 284 (1979), citing *In re Winship*, 397 US 358, 364; 90 S Ct 1068; 25 L Ed 2d 368 (1970). To determine whether the prosecution produced evidence sufficient to support a conviction, this Court reviews the evidence "in the light most favorable to the prosecutor" to determine " 'whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010), quoting *People v Hardiman*, 466 Mich 417, 429; 646 NW2d 158 (2002). "[A] reasonable doubt is an honest doubt based upon reason. It is a state of mind that would cause the [fact-finder] to hesitate when acting in the graver and more important affairs of life." *People v Jackson*, 167 Mich App 388, 391; 421 NW2d 697 (1988)

---

[1] *People v Vahovick*, unpublished order of the Court of Appeals, entered October 21, 2024 (Docket No. 365933).

[2] *People v Vahovick*, unpublished order of the Court of Appeals, entered March 4, 2025 (Docket No. 365933).

[3] See *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

[4] *People v Vahovick*, unpublished order of the Court of Appeals, entered March 28, 2025 (Docket No. 365933).

[5] US Const, Am XIV, § 1; Const 1963, art 1, § 17.

(citation omitted). Direct and circumstantial evidence, as well as all reasonable inferences that may be drawn from it, are considered to determine whether the evidence was sufficient to sustain the conviction. *Hardiman*, 466 Mich at 429.

In this case, defendant argues that he presented evidence, which the prosecution did not successfully rebut, that his crimes were excused by the common-law affirmative defense of duress. See *People v Lemons*, 454 Mich 234, 245; 562 NW2d 447 (1997). An otherwise criminal act may be excused if it was performed under compulsion or duress. *People v Hubbard*, 115 Mich App 73, 78; 320 NW2d 294 (1982); see also *People v Dupree*, 284 Mich App 89, 104; 771 NW2d 470 (2009). The policy underlying the defense is that "it is better for a person to choose to commit a crime than to face a greater evil threatened by another person." *People v Chapo*, 283 Mich App 360, 372; 770 NW2d 68 (2009).

An act is done under duress when it is done in response to a compulsion that is "present, imminent and impending, and of such a nature as to induce a well-grounded apprehension of death or serious bodily harm if the act is not done." *Hubbard*, 115 Mich App at 78. Our Supreme Court has set forth the following elements for proof of the defense of duress:

> A) The threatening conduct was sufficient to create in the mind of a reasonable person the fear of death or serious bodily harm;
>
> B) The conduct in fact caused such fear of death or serious bodily harm in the mind of the defendant;
>
> C) The fear or duress was operating upon the mind of the defendant at the time of the alleged act; and
>
> D) The defendant committed the act to avoid the threatened harm. [*Lemons*, 454 Mich at 247.]

In this case, defendant testified that his "life was threatened" by Watson, forcing defendant to assault him to avoid being harmed. Defendant stated that Watson had spit in his face on the day of the assault and had told him to get his "bitch ass back" to his cell block while defendant was walking from the food line back to his cell. According to defendant, Watson had rudely accused defendant of hiding food about a week earlier, and had told him to return to his cell from the food line when defendant complained that food was missing from his tray. Defendant also testified that "a couple days" before the assault, Watson had followed him out of the food hall and had whispered to him that he would "handcuff me to go to the hole. Because there ain't no cameras . . . in the cells in the hole. And he said to me that, I could handcuff you and take a couple of my officers down there and beat you."

Viewed in the light most favorable to the prosecution, defendant's evidence, even if the jury found it credible, did not establish an imminent threat to his physical well-being. The threat of future injury is insufficient to establish duress. *Hubbard*, 115 Mich App at 78. In fact, the evidence showed that, after encountering Watson in the food hall, defendant returned to the relative safety of his cell before fashioning a weapon and returning to the food line. The evidence did not

suggest that any threat Watson presented to defendant was immediately present or impending, because defendant had returned to his cell after going through the food line and Watson continued to monitor inmates in that line. A rational jury could have concluded that defendant's attack was not made in response to an imminent threat. *Tennyson*, 487 Mich at 735.

Additionally, defendant testified to the jury that Watson had "disrespected me in front of all these inmates," and that "if an officer does that you know you're labeled like you're a punk so you have to do something in there." Defendant added that he was "furious," because "I ain't going to let nobody spit on me," and that what he was trying to accomplish was for Watson "not to disrespect me anymore, you know. Or anybody else at the time." It was only after defense counsel repeatedly asked defendant about his purpose for the assault that defense counsel suggested, at the end of direct examination, "[a]nd was that to prevent you being harmed?" to which defendant responded affirmatively. A reasonable jury could have concluded that defendant's motive for the attack was not because of an imminent threat, but rather to get revenge or to "save face" by showing that he could not be disrespected without consequences. *Id.*

Further, the prosecution presented evidence that defendant had failed to use the prison's reporting system to report Watson's alleged threats. Even though defendant testified that he thought that any formal reporting would be futile, the fact that defendant took no action in response to Watson's alleged threats, considered along with defendant's clear admission that he was "furious" about Watson's lack of respect, cuts against defendant's claim that he acted out of a well-grounded apprehension of death or serious bodily harm. *Hubbard*, 115 Mich App at 78.

For these reasons, that the evidence offered at trial was sufficient to rebut the defense of duress and support defendant's convictions. *Ericksen*, 288 Mich App at 195.

### III. OFFENSE VARIABLES

Defendant argues that the trial court erroneously scored OV 3, OV 7, and OV 10. We agree. The prosecution concedes that OVs 3 and 10 were scored incorrectly. We note that defendant's challenge to OV 7 is unpreserved; accordingly, we could decline to consider it. See MCL 769.34(10); MCR 6.429(C). However, although this Court "is *obligated* only to review issues that are properly raised and preserved," this Court remains "*empowered . . .* to go beyond the issues raised and address any issue that, in the court's opinion, justice requires be considered and resolved.' " *People v Cain*, 238 Mich App 95, 127; 605 NW2d 28 (1999) (quotation marks and citation omitted). In this case, because the scoring of OV 7 added 50 points to defendant's OV total and altered his guidelines range, we exercise our discretion to disregard our issue preservation requirements concerning this claim of error.

This Court reviews the trial court's factual determinations at sentencing for clear error. See *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*. See also *People v Calloway*, 500 Mich 180, 184; 895 NW2d 165 (2017). We review unpreserved claims of error for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

A sentencing court must consult the advisory sentencing guidelines and assess the highest amount of possible points for all offense variables. *People v Lockridge*, 498 Mich 358, 392 n 28; 870 NW2d 502 (2015). The sentencing offense determines which offense variables are to be assessed, and the appropriate offense variables are generally assessed by reference to the sentencing offense. *People v Sargent*, 481 Mich 346, 348; 750 NW2d 161 (2008). "A defendant is entitled to be sentenced by a trial court on the basis of accurate information." *People v Francisco*, 474 Mich 82, 88; 711 NW2d 44 (2006). A trial court relies on inaccurate information when it sentences a defendant by consulting an inaccurate advisory guidelines range. *Id*. at 89 n 7.

"A sentencing court has discretion in determining the number of points to be scored, provided that evidence of record adequately supports a particular score." *People v Dickinson*, 321 Mich App 1, 21; 909 NW2d 24 (2017). The trial court's factual determinations regarding offense variables must be supported by a preponderance of the evidence. *People v Osantowski*, 481 Mich 103, 111; 748 NW2d 799 (2008). "The trial court may rely on reasonable inferences arising from the record evidence to sustain the scoring of an offense variable." *People v Earl*, 297 Mich App 104, 109; 822 NW2d 271 (2012).

A. OV 3

Defendant argues, and the prosecution agrees, that the trial court improperly assessed OV 3 at 25 points when it should have been assessed at 10 points. OV 3 considers physical injury to a victim and is properly assessed at 25 points when the victim suffered a "life threatening or permanent incapacitating injury." MCL 777.33(1)(c). OV 3 is assessed at 10 points when the victim incurred a "bodily injury requiring medical treatment," regardless of whether such treatment was actually obtained. MCL 777.33(1)(d); MCL 777.33(3).

In this case, Watson testified that, as a result of the attack, his head was bleeding and required five staples to close the laceration, and that he had marks and cuts on his face. Lieutenant Thomas Goodin testified that Watson was bleeding heavily from his head immediately after the attack and required medical attention. The trial court assessed 25 points for OV 3 over defendant's objection, stating:

> [T]he defendant swung this padlock on a string I mean in an almost preemptive attack when the officer was totally not ready to shield and defend himself and he very easily could have, not only killed him, but he certainly could, and he could have had every ability and an ultimately, you know, inflicted a relatively significant gash in his head. So I think those points are properly scored.

It appears that the trial court assessed 25 points on the basis of how severe the injuries from defendant's attack *could* have been, rather than on the basis of the *actual* severity of the resulting injuries. But "OV 3 does not assess whether a *defendant's actions* were life threatening; rather, OV 3 assesses whether a *victim's injuries* were life-threatening." *People v Rosa*, 322 Mich App 726, 746; 913 NW2d 392 (2018). In this case, the evidence supported the conclusion that Watson's head injury required medical attention, but no evidence was presented that the injury he received was life-threatening. Consequently, the trial court erred by assessing 25 points instead of 10 points for OV 3. *Hardy*, 494 Mich at 438.

## C. OV 10

Defendant also argues, and the prosecution concedes, that OV 10 was incorrectly scored at 15 points. We agree. OV 10 covers exploitation of a victim's vulnerability. MCL 777.40(1). The trial court should assess 15 points for this OV when predatory conduct was involved. See MCL 777.40(1)(a). "Predatory conduct" is defined as "preoffense conduct directed at a victim for the primary purpose of victimization." MCL 777.40(3)(a); see also *People v Cannon*, 481 Mich 152, 162; 749 NW2d 257 (2008). Predatory conduct involves only conduct that is "commonly understood as being 'predatory' in nature, e.g., lying in wait and stalking, as opposed to purely opportunistic criminal conduct or 'preoffense conduct involving nothing more than run-of-the-mill planning to effect a crime or subsequent escape without detection.'" *People v Huston*, 489 Mich 451, 462; 802 NW2d 261 (2011), quoting *Cannon*, 481 Mich at 162. Predatory conduct is conduct that "created or enhanced" a victim's vulnerability, including actions to gain a victim's trust and exploiting the trust to facilitate a crime. *People v Barnes*, 332 Mich App 494, 503-504; 957 NW2d 62 (2020).

In this case, defendant argues, and the prosecution agrees, that his preoffense conduct was run-of-the-mill planning to commit the crime. Defendant testified that he had an unpleasant encounter with Watson, went to his cell to obtain a weapon, and returned to the food line where he attacked Watson. Watson testified that he did not see defendant approach and was aware of the attack only when he felt the impact.

The trial court focused on the evidence that Watson was surprised by the attack. But the evidence at trial showed that defendant's attack was opportunistic; there was no evidence that defendant stalked Watson or lay in wait for the ideal moment to strike. In fact, defendant's assault on Watson occurred in a food hall during meal service, on camera, with other corrections officers nearby who were able to restrain defendant relatively quickly. The evidence at trial did not support the conclusion that defendant engaged in predatory conduct, and the trial court erred by assessing 25 points for OV 10. *Hardy*, 494 Mich at 438. Although the prosecution argues that 5 points could have been scored for defendant's exploitation of Watson's distraction by his work duties, MCL 777.40(1)(c) provides that a score of 5 points is appropriate where "[t]he offender exploited a victim by his or her difference in size or strength, or both, or exploited a victim who was intoxicated, under the influence of drugs, asleep, or unconscious." None of these elements were established at trial; accordingly, OV 10 should have been scored at zero points.

## D. OV 7

Defendant also argues that the trial court erred by scoring OV 7 at 50 points. We agree. OV 7 covers aggravated physical abuse and is properly scored at 50 points when "[a] victim was treated with sadism, torture, or excessive brutality or conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." MCL 777.37(1)(a). The record reflects that the trial court assessed 50 points because of the excessive brutality of the assault.

When scoring OV 7, the trial court should "determine whether the defendant engaged in conduct beyond the minimum necessary to commit the crime, and whether it is more probable than not that such conduct was intended to make the victim's fear or anxiety increase by a considerable amount." *Hardy*, 494 Mich at 443. In this case, according to Watson, defendant struck him several

-6-

times with the padlock until Watson was able to force defendant to the floor and hold him until other officers arrived and removed defendant from the scene.

We conclude that defendant's conduct did not rise to the level of cruelty required to assess points for OV 7. Although the assault was a violent attack and defendant struck Watson several times, it was clear from the evidence that the blows were delivered as part of defendant's attempt to inflict grievous bodily harm on Watson—they were not "excessive[ly] brutal" beyond the violence inherent in the sentencing offense, nor was there evidence that any of the blows were "designed to substantially increase the fear and anxiety a victim suffered during the offense." The trial court therefore plainly erred by assessing 50 points, rather than zero points, for OV 7. *Carines*, 460 Mich at 763.

Because correction of the scores for OVs 3, 7, and 10 results in a change in the recommended guidelines range for the minimum sentence, we remand this case to the trial court for resentencing. See *Francisco*, 474 Mich at 89-90.

## IV. JUDICIAL BIAS

Defendant argues that the trial court demonstrated bias against defendant and in favor of the prosecution when it questioned witnesses during trial. We disagree. Whether the conduct of a trial judge "denied defendant a fair trial is a question of constitutional law that this Court reviews de novo." *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015).

Because a defendant has a right to a neutral and detached judge, "the trial court's examination of witnesses may not 'pierce the veil of judicial impartiality.' " *People v McDonald*, 303 Mich App 424, 437; 844 NW2d 168 (2013), quoting *People v Davis,* 216 Mich App 47, 50; 549 NW2d 1 (1996). "A trial court may not assume the prosecutor's role with advantages unavailable to the prosecution." *Id.* at 51 (quotation marks and citation omitted). A trial court questioning witnesses must "ensure that its questions are not intimidating, argumentative, prejudicial, unfair, or partial." *People v Conyers*, 194 Mich App 395, 404-405; 487 NW2d 787 (1992).

A trial court has the authority and obligation to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence" in order to make the interrogation and presentation effective for the ascertainment of the truth. MRE 611(a)(1). Additionally, "The court may interrogate witnesses, whether called by itself or by a party." MRE 614(b). However, the trial court "must not allow its views on disputed issues of fact to become apparent to the jury." *Cole v Detroit Auto Inter-Ins Exch*, 137 Mich App 603, 610; 357 NW2d 898 (1984). The test to determine whether a trial court's questions denied a defendant a fair trial is whether the questions "*may* well have unjustifiably aroused suspicion in the mind of the jury' as to a witness' credibility, . . . and whether partiality *quite possibly could* have influenced the jury to the detriment of defendant's case." *Conyers*, 194 Mich App at 405 (quotation marks and citations omitted).

The conduct of a trial judge can violate a defendant's "constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *People v Stevens*, 498 Mich 162, 171; 869 NW2d 233 (2015). To determine whether a

trial judge's conduct pierced the veil of impartiality, the appellate court evaluates several factors, "including the nature of the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions." *Id*. at 172.

During trial in this case, the trial court asked Watson and other witnesses questions regarding the procedure by which prisoners could make a complaint about corrections officers or other inmates. Defendant argues that, with these questions, the trial court was working with the prosecutor to discredit defendant's anticipated duress defense. However, defense counsel suggested in his opening statement that defendant's assault should be excused because Watson had been mistreating defendant, who had no choice in a prison environment but to physically retaliate because the available "other avenues of redress would not have satisfactorily remedied the threats" Watson had made against defendant. In this context, the trial court's questions regarding the procedures for inmate complaints merely provided additional general factual information regarding a topic that the defense had introduced.

Defendant further argues that the trial court's questions to Watson about his job responsibilities when supervising the food line constituted an improper "character reference" and had the effect of depicting Watson as vulnerable to defendant's attack. We disagree. The trial court's questions sought information regarding Watson's conduct immediately before the attack and provided a factual context for the jurors, who may have been unfamiliar with prison operations. The responses elicited by the court's questions did not favor either party. Defendant also notes that the trial court elicited testimony from Watson and another corrections officer, Daniel Shaffer, that a padlock with a cord, or a "lock in a sock," was a "prison weapon" they had encountered previously. Defendant argues that the trial court was thus proving an element of the prisoner in possession of a weapon charge. However, after Watson referred to the padlock as a weapon, the trial court immediately clarified that the jury was charged with determining whether defendant used his lock as a weapon, and that Watson's testimony concerned Watson's *belief* about whether a lock could be used as a weapon, not a legal conclusion regarding an element of a crime for which defendant was charged. Shaffer never referred to a "lock in a sock" as a weapon, and his role in the events surrounding Watson's assault was limited to seizing defendant's padlock while escorting him away from the food line. Defendant has not shown that the trial court's questions of Watson and Shaffer were prejudicial, unfair, or partial. See *Conyers*, 194 Mich App 3at 404-405.

The trial court asked additional questions of several witnesses concerning various aspects of prison operations, including the procedure for placing prisoners in isolation cells, whether food service was provided by an outside company rather than corrections officers, and how prisoners receive padlocks. Defendant argues that these questions implied to the jury that the trial court was knowledgeable regarding prison operations and therefore strengthened the trial court's potential influence on the jury in favor of the prosecution. However, as discussed, the trial court's questioning of Watson and other corrections officers and witnesses did not demonstrate bias or favoritism. *Id.* Accordingly, the trial court's general questions concerning prison operations did not favor either party but merely provided more factual context for the jury.

Watson testified at trial that surveillance videos were saved for 30 days, such that any additional video footage of the incident besides that which was shown in court would no longer exist. Defense counsel interjected that he could not have timely requested the video because he was successor counsel appointed while the case was in progress. During this discussion, the trial court remarked that other parties besides defense counsel could have requested the video before its deletion. Defendant argues that the trial court's statement damaged defense counsel's credibility to the jury; however, ultimately we do not see how a brief colloquy concerning hypothetical additional video that could have been requested by either party demonstrates that the trial court was biased in favor of the prosecution. *Id.*[6]

The trial court also asked an inmate defense witness, Gavin McNitt, whether there was a system by which an inmate could report issues or complaints to the prison counselor. McNitt confirmed that there was such a system. The prosecuting attorney then asked McNitt whether he had prepared any such grievance concerning Watson, which McNitt denied. Defendant argues that the trial court thereby assisted the prosecution in the "impeachment" of McNitt. However, defendant does not explain how McNitt's failure to report any objectionable conduct by Watson that he may have observed was harmful to the defense's argument that the prisoner-grievance process was futile or otherwise helpful to the prosecution.

In this case, there was no evidence that the trial court was biased in favor of the prosecution. The court asked a few clarifying questions that were primarily about prison operations and addressed both parties in its discussions of an evidentiary matter while the jury was absent. Further, the trial court instructed the jury that its questions should not be taken to reflect its opinion on the evidence. For these reasons, we conclude that defendant has failed to show that the trial court improperly influenced the jury when questioning witnesses, *Stevens*, 498 Mich at 171, or otherwise pierced the veil of impartiality, *McDonald*, 303 Mich App at 437.

V. VOIR DIRE

Defendant also argues that the trial court committed reversible error in conducting voir dire. We disagree. Defendant did not preserve this claim of error by objecting below; accordingly, our review is for plain error affecting substantial rights. *Carines*, 460 Mich at 763.

The Sixth Amendment of United States Constitution guarantees a fair trial by a panel of impartial jurors. *People v DeLeon*, 317 Mich App 714, 722; 895 NW2d 577 (2016). See also Const 1963, art 1, § 14. Accordingly, a defendant has a "right to a fair and impartial jury" with jurors who consider only "the evidence that is presented to them in open court." *People v Budzyn*,

_____

[6] Defendant also argues that the trial court demonstrated bias during a discussion outside the presence of the jury by stating that Lieutenant Thomas Goodin could be asked whether defendant had ever requested that prison officials obtain surveillance video in order to investigate Watson's alleged harassment of defendant. We do not see how such a statement indicates bias or favoritism. Defendant admitted to not pursuing a grievance or complaint process against Watson because he believed it to be futile; therefore, permitting Goodin to testify that defendant had never requested surveillance video footage would seem to have little impact on any disputed issues in this case.

456 Mich 77, 88; 566 NW2d 229 (1997). Jurors are "presumed to be impartial" until shown otherwise, and the "burden is on the defendant to establish that a juror was not impartial or that a juror's impartiality is in reasonable doubt." *People v Miller*, 482 Mich 540, 550; 759 NW2d 850 (2008) (quotation marks and citation omitted).

An important function of voir dire is to allow the trial court and the parties to discover bias that would render a potential juror incompetent to serve. *People v Jendrzejewski*, 455 Mich 495, 509; 566 NW2d 530 (1997). Because the trial court has broad discretion in conducting voir dire, the law "does not lend itself to hard and fast rules regarding what is acceptable and what is unacceptable," short of a failure "to elicit enough information during voir dire to make an intelligent assessment of bias." *People v Tyburski*, 445 Mich 606, 623; 518 NW2d 441 (1994). A trial court ensures an impartial jury by "conduct[ing] a thorough and conscientious voir dire." *Id*. The voir dire must "allow the elicitation of enough information so that the court itself can make an independent determination of a juror's ability to be impartial." *Id*. at 620.

"To the extent that [a] defendant maintains that the process did not result in an impartial jury, [the] defendant has the burden to show that a particular juror was not impartial or, at the very least, that the juror's impartiality was in reasonable doubt." *People v Haynes*, 338 Mich App 392, 411; 980 NW2d 66 (2021). A conviction may not be reversed for that reason unless the totality of circumstances indicates that "the defendant's trial was not fundamentally fair and held before a panel of impartial, indifferent jurors." *People v Cline*, 276 Mich App 634, 638; 741 NW2d 563 (2007) (quotation marks and citations omitted).

At the beginning of voir dire in this case, the trial court was informed by the court clerk that the jury pool consisted of 36 potential jurors out of the 60 who had been sent a jury summons. The trial court remarked that those who were absent were subject to a show-cause hearing and potential penalty of a $200 fine or two days in jail. The trial court then stated:

> So all those other people, I mean I'll deal with those on another day. And they'll, for the most part get scheduled. They'll probably get double the amount of jury time because very few of them want to do the $200.00 fine and also none of them do the two days in jail.
>
> And I will warn you . . . , you've got to be careful because I sent a juror last year to jail. And he got up in a case and, I don't know whether he was at McThirsty's Pub the night before or whatever. My defendant was African-American and a woman. And he got up and told me that he didn't like blacks, and he didn't like women. And . . . I said, you're in contempt of court. The sheriff is going to take you over to the county jail and you're going to do the rest of your jury service over that [sic] for two days. That's the only time I ever had to do that. So . . . be careful about where you get that advice how to get out of jury duty. Because I think that was his plan all along. Oh, they won't keep me on this jury. They won't do anything to me. Well, he did his two days and he asked to do the $200 and I said, no. Two nights next door.

Defendant argues that this story dissuaded potential jurors from disclosing any biases they had when questioned during voir dire. We disagree. In context, it is clear that the trial court was not stating that potential jurors disclosing actual biases would be punished, but rather warning the jury pool to take its duty seriously and not to attempt to avoid jury duty by pretending to be biased. Defendant has not raised a reasonable doubt regarding any juror's impartiality. *Haynes*, 338 Mich App 3 at 411.

Defendant also notes that the trial court referred to the prison system as "a good employer" in the area, and asked if any of the potential jurors had a problem with the prosecution of a prison inmate who was alleged to have committed a crime while in prison. The trial judge also told a brief anecdote about a case he had tried as a prosecutor involving criminal inmate defendants; the point of the anecdote appears to have been simply that criminal trials can sometimes last a long time. Additionally, during an exchange with a prospective juror, the trial court made the following remarks:

> Some people make mistakes in life. . . . They own up to what they did. They go to prison and some of them even come out far better people. I mean they come out good people. . . . [I]t's a life defining experience for I'm sure a lot of inmates.

> A lot of them are bad people. Some of them are really good people. You know, I mean some of them just got caught up in bad circumstances.

Defendant argues that the trial court's comments revealed a favoritism to the prosecution or a bias against prison inmates. We disagree. The trial court's comments were relatively benign and, if anything, presented a balanced view of prison inmates as consisting of both good and bad people. Defendant has not demonstrated that the trial court's conduct improperly influenced the jury. *Stevens*, 498 Mich at 174.

## VI. PROSECUTORIAL MISCONDUCT

Defendant argues that the prosecution impermissibly shifted the burden of proof by asking questions and presenting arguments that commented on defendant's post-arrest silence, and by commenting on defendant's failure to present evidence of his innocence. We disagree. We review unpreserved claims of prosecutorial misconduct[7] for plain error affecting substantial rights. *People v Norfleet*, 317 Mich App 649, 660 n 5; 897 NW2d 195 (2016); *Carines*, 460 Mich at 763.

---

[7] "Prosecutorial misconduct" is a term of art often used to describe any error committed by the prosecution, even though claims of inadvertent error by the prosecution are "better and more fairly presented as claims of 'prosecutorial error,' with only the most extreme cases rising to the level of 'prosecutorial misconduct.' " *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015). In this case, defendant alleges that the prosecution engaged in intentional misconduct designed to shift the burden of proof to defendant; accordingly, we will treat defendant's claim as one for prosecutorial misconduct.

The prosecution has a duty to ensure that a defendant receives a fair trial. *People v Farrar*, 36 Mich App 294, 299; 193 NW2d 363 (1971). The responsibility of the prosecution is "to seek justice, rather than merely to convict." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007), lv den 480 Mich 897 (2007). "The test of prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *Dobek*, 274 Mich App at 63. A fair trial "can be jeopardized when the prosecutor interjects issues broader than the guilt or innocence of the accused." *Id*. at 63-64. The prosecution may not comment on a defendant's silence or failure to present evidence, because such comments tend to shift the burden of proof. *People v Davis*, 199 Mich App 502, 517; 503 NW2d 457 (1993). Prosecutorial comments must be read as a whole and evaluated in context, including the arguments of the defense and the relationship they bear to the evidence. *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004).

In this case, defendant argues that the prosecution asked several impermissible questions of witnesses designed to shift the burden of proof to defendant or comment on his silence. Specifically, the prosecution asked Watson whether anyone had requested surveillance video related to the incident, and whether the prison would pay more attention to a grievance that other prisoners had corroborated; the prosecution elicited testimony from Morgan and Shaffer regarding defendant's silence after the incident; the prosecution asked Lieutenant Goodin about what conduct by an officer could result in a grievance, whether the prison could examine video footage in response to a grievance, and whether defendant had filed a grievance; and the prosecution asked defendant whether he told anyone at the prison that Watson had spit in his food, and whether the harassing incident would have been recorded on surveillance video.

Further, defendant argues that the prosecution impermissibly stated during closing argument that "[n]othing is presented on this record that a single person outside of the defendant sitting here in trial has ever heard of how terrible Officer Watson is."

Read in context, the prosecution's questions and comments do not rise to the level of reversible error. The prosecution clearly stated that it had the burden of proof and that defendant did not have to prove his innocence. And the challenged questions were appropriate in light of defendant's theory of the case; an important part of that theory was that defendant believed that the official procedures for addressing complaints were inadequate. In his opening statement, defense counsel suggested to the jury that defendant's crime should be excused because "other avenues of redress would not have satisfactorily remedied the threats" Watson had made against defendant. Attacking the credibility behind a theory advanced by the defense does not shift the burden of proof. *McGhee*, 268 Mich App at 635. Similarly, eliciting evidence regarding defendant's access to, or use of, "other avenues of redress" was properly responsive to the defense theory and did not impermissibly shift the burden of proof. Further, to the extent defendant argues that the prosecution improperly elicited testimony regarding defendant's silence, we find no error requiring reversal for the reasons stated Part VII(C) of this opinion.

Regarding the prosecutor's comment during closing argument, prosecuting attorneys have "great latitude regarding their arguments" in closing, and are "generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *Unger*, 278 Mich App at 236. The prosecution's statement invited the jury to consider whether defendant's testimony regarding Watson's behavior was credible; it was not an attempt to shift the burden of proof. *Davis*, 199 Mich App at 517.

## VII. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also argues that his trial counsel was ineffective in several respects. We disagree. We review de novo the constitutional question whether an attorney's ineffective assistance deprived a defendant of his Sixth Amendment right to counsel, and we review for clear error the trial court's findings of fact. *Id.* at 242. Because no *Ginther* hearing was held, our review is limited to errors apparent on the record. *People v Unger*, 278 Mich App 210, 253; 749 NW2d 272 (2008).

A defendant's right to counsel is guaranteed by the United States and Michigan Constitutions. US Const, Am VI; Const 1963, art 1, § 20. The "right to counsel encompasses the right to the effective assistance of counsel." *People v Cline*, 276 Mich App 634, 637; 741 NW2d 563 (2007). The "effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Rodgers*, 248 Mich App 702, 714; 645 NW2d 294 (2001). In order to prevail on a claim of ineffective assistance of counsel, a defendant must show "that counsel's performance was deficient" and "that counsel's deficient performance prejudiced the defense." *People v Taylor*, 275 Mich App 177, 186; 737 NW2d 790 (2007) (quotation marks and citation omitted). A defense attorney's performance is deficient if "it fell below an objective standard of professional reasonableness." *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007). The performance will be deemed to have prejudiced the defense if it is reasonably probable that, but for counsel's error, "the result of the proceeding would have been different." *Id.* "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

### A. TRIAL COURT'S STATEMENTS AND QUESTIONS

Defendant argues that his counsel was ineffective for failing to object to the trial court's statements during voir dire, and for failing to object to the trial court's questions to witnesses during trial. Because, as discussed, we find no error requiring reversal regarding the trial court's statements and questions, defendant cannot show that he was prejudiced by his counsel's failure to raise futile objections. *Jordan*, 275 Mich App at 667; *Ericksen*, 288 Mich App at 201.

### B. VIDEO REPLAY

Defendant also argues that his trial counsel should have objected to the repeated playing of the prison's surveillance video of defendant's assault on Watson. We disagree. "Generally, all relevant evidence is admissible at trial." MRE 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Even relevant evidence may be excluded under MRE 403 if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *People v Watkins,* 491 Mich 450, 481; 818 NW2d 296 (2012). Unfair prejudice occurs when there is a tendency for the evidence "to be given undue or preemptive weight" by the jury, or when it "would be inequitable to allow use" of the evidence. *People v Wilson*, 252 Mich App 390, 398; 652 NW2d 488 (2002), citing *People v Mills*, 450 Mich 61, 75-76; 537 NW2d 909 (1995). Evidence that is unfairly prejudicial goes beyond the merits of the case to inject issues broader than the defendant's

guilt or innocence, such as "bias, sympathy, anger, or shock." *People v McGhee*, 268 Mich App 600, 614; 709 NW2d 595 (2005).

In this case, the video evidence showing defendant attacking Watson at the food line was highly relevant to whether he had committed the crime of assaulting Watson. Defendant does not contend otherwise, but argues that the video should not have been played repeatedly because it was "shocking, violent, and gruesome." We disagree. Although the surveillance footage does depict a violent assault, there are no aspects of the video that would lead to us to conclude that repeated viewings unfairly prejudiced defendant by inflaming the jury. *McGhee*, 268 Mich App at 614. The footage was taken from a camera placed on the ceiling of the dining hall; there were no close-up views of Watson's injuries or other aspects of the video that might have been given undue weight by the jury. *Wilson*, 252 Mich App at 398. There is no indication from the record that any viewers of the video were particularly shocked or affected by what they saw. Defendant has not carried his burden of showing that his counsel should have raised an objection or that he was prejudiced by his counsel's lack of objection. *Jordan*, 275 Mich App at 667; *Ericksen*, 288 Mich App at 201.

## C. DEFENDANT'S SILENCE

Defendant also argues that his trial counsel should have objected to testimony from witnesses regarding his refusal to speak to prison investigators following the assault. We disagree. "No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law." Const 1963, art 1, § 17. Michigan's constitutional provision against self-incrimination is applied consistently with and "no more liberally than the Fifth Amendment of the United States Constitution."[8] *People v Geno*, 261 Mich App 624, 628; 683 NW2d 687 (2004). "The constitutional privilege against self-incrimination protects a defendant from being compelled to testify against himself or from being compelled to provide the state with evidence of a testimonial or communicative nature." *People v Burhans,* 166 Mich App 758, 761-762; 421 NW2d 285 (1988). The protections provided in *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), are intended to protect defendants against self-incrimination in an environment of governmental coercion, the custodial interview. *People v Cheatham*, 453 Mich 1, 10-11; 551 NW2d 355 (1996). A person must be given a series of *Miranda* warnings before being subjected to custodial interrogation in order to protect the constitutional privilege against self-incrimination. *People v Tanner*, 496 Mich 199, 207-208; 853 NW2d 653 (2014). A statement obtained from a defendant during a custodial interrogation is admissible only if the defendant "voluntarily, knowingly, and intelligently" waived his Fifth Amendment rights. *Miranda,* 384 US at 444; *People v Daoud*, 462 Mich 621, 632-639; 614 NW2d 152 (2000). "[A]n inmate's imprisonment alone is not sufficient to constitute custody for *Miranda* purposes." *People v Cortez*, 299 Mich App 679, 694; 832 NW2d 1 (2013) (citation omitted).

A defendant's right to due process is violated when the prosecutor uses post-arrest, post-*Miranda* silence "for impeachment or as substantive evidence unless it is used to contradict the

---

[8] US Const, Am V provides, in part: "No person . . . shall be compelled in any criminal case to be a witness against himself."

defendant's trial testimony that he made a statement, that he cooperated with police, or that trial was his first opportunity to explain his version of events." *People v Solmonson*, 261 Mich App 657, 664; 683 NW2d 761 (2004), citing *Doyle v Ohio,* 426 US 610, 619 n 11; 96 S Ct 2240; 49 L Ed 2d 91 (1976). A prosecutor may not comment on a defendant's silence or failure to present evidence, because such comments tend to shift the burden of proof. *People v Davis*, 199 Mich App 502, 517; 503 NW2d 457 (1993). And "the right against self-incrimination prohibits a prosecutor from commenting on the defendant's silence in the face of accusation, but does not curtail the prosecutor's conduct when the silence occurred before any police contact." *People v Goodin*, 257 Mich App 425, 432; 668 NW2d 392 (2003).

At trial, Officer Mason Morgan testified that he helped transport defendant from the food line to the hospital, and that defendant "said he didn't want treatment. He did not want to be evaluated. He didn't want to cooperate," and that the only thing he said was that he would do it again. Officer Daniel Shaffer assisted in escorting defendant and testified that defendant said "he wouldn't talk to anyone." During his cross-examination of Goodin, defense counsel asked whether defendant was subject to a disciplinary hearing for the assault, and Goodin testified that defendant was transferred to, and had a hearing at, the next facility, and added that defendant refused to participate in the hearing.

Defendant has not alleged that his statements to Morgan and Shaffer were made during a custodial interrogation or while defendant was in custody. Accordingly, defendant's trial counsel could not have successfully objected that defendant's right to silence was being breached. Moreover, defendant has not established that these brief statements concerning defendant's unwillingness to talk immediately after the incident were prejudicial to his defense, especially considering defense counsel's argument that defendant believed that the prison's administration and complaint process could not have helped him.

Regarding Goodin's comment about defendant's silence at his disciplinary hearing, it was nonresponsive and beyond the scope of defense counsel's question. Defense counsel could have objected to Goodin's response, but instead quickly moved on, which avoided calling any further attention to Goodin's statement regarding defendant's silence. Declining to raise objections can often be consistent with sound trial strategy, *Taylor*, 275 Mich App at 186, which a reviewing court should not second-guess with the benefit of hindsight, *People v Matuszak*, 263 Mich App 42, 58; 687 NW2d 342 (2004). Moreover, the prosecution did not rely on Goodin's statement in making its arguments concerning defendant's guilt. Defendant had not carried his burden of showing either an objectively deficient performance from counsel or prejudice regarding this issue. *Jordan*, 275 Mich App at 667; *Ericksen*, 288 Mich App at 201.

## D. MISCONDUCT PROCEEDING

Defendant also argues that his trial counsel was ineffective for eliciting testimony from Goodin that revealed that defendant was found guilty of assaulting Watson in prison disciplinary proceedings. We disagree. On cross-examination, defense counsel asked Goodin whether there was a misconduct hearing, and about its results, eliciting that defendant was found guilty and received time in detention. Defendant argues that the jury could infer defendant's guilt from the results of the misconduct hearing. However, as stated, defendant did not contest that he had committed the assault; he instead argued that he should be not held accountable for it in light of

the alleged duress.  In light of the other evidence introduced at trial and defendant's theory of the case, defendant has not shown that Goodin's brief testimony concerning the misconduct hearing was prejudicial.  *Id.*

## E.  MITIGATING CIRCUMSTANCES INSTRUCTION

Defendant also argues that his trial counsel was ineffective for failing to request an instruction on mitigating circumstances, specifically provocation for the AWIGBH charge.  We disagree.

Defendant's proposed instruction is inapplicable to his case.  Defendant was convicted of AWIGBH, MCL 750.84.  Provocation is a factor that can reduce a homicide charge from murder to manslaughter; it is not a defense to AWIGBH.  In *People v Mitchell*, 149 Mich App 36, 37-38; 385 NW2d 717 (1986), the defendant argued that, because the trial court had found that the defendant's crime was provoked, he could not be convicted of AWIGBH.  This Court concluded that a defendant having acted because he was provoked, or in the heat of passion, was irrelevant to the crime of AWIGBH.  *Id*. at 39 ("If a defendant has such intent, the fact that he was provoked or that he acted in the heat of passion is irrelevant to a conviction.").  This Court reasoned that, although an intent to murder can be mitigated by provocation to manslaughter, the intent to do great bodily harm does not involve an intent to murder; therefore "[a]n assault is not mitigated to a lesser offense because of the existence of provocation."  *Id*. at 38-39.  In *People v Stevens*, 306 Mich App 620, 628-629; 858 NW2d 98 (2014), this Court reiterated that an intent to do serious injury short of murder is not mitigated by provocation.  Defendant's counsel was therefore not ineffective for failing to request an inapplicable jury instruction.  *Ericksen*, 288 Mich App at 201.

## F.  PROSECUTORIAL MISCONDUCT

Defendant argues that his counsel was ineffective for failing to object to the prosecution's questions and statements that defendant has identified as misconduct.  Because, as discussed, we find no error requiring reversal regarding the prosecution's statements and questions, defendant cannot show that he was prejudiced by his counsel's failure to raise futile objections.  *Jordan*, 275 Mich App at 667; *Ericksen*, 288 Mich App at 201.

We affirm defendant's convictions and remand for resentencing.  We do not retain jurisdiction.

/s/ Allie Greenleaf Maldonado
/s/ Mark T. Boonstra
/s/ Randy J. Wallace